(79 South. 430)

No. 22071.

ALLISON v. FIREMEN'S INS. CO. OF NEWARK, N. J.

(May 27, 1918.    Rehearing Denied June 29, 1918.)

*(Syllabus by Editorial Staff.)*

INSURANCE ⬅══665(4) — FIRE INSURANCE — PROPERTY COVERED—OWNERSHIP.

In an action on a binder of insurance on paintings alleged to have been destroyed by fire, evidence *held* to show that plaintiff did not possess the works of some of the painters whose names appeared upon his list of titles and painters submitted to insurer's agent.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Samuel J. Allison against the Firemen's Insurance Company of Newark. N. J. Judgment for defendant, and plaintiff appeals. Affirmed.

Edwin Laizer and Charles Louque, both of New Orleans, for appellant. St. Clair Adams, of New Orleans, for appellee.

O'NIELL, J. The plaintiff appeals from a judgment rejecting his demand of $20,000 on a binder of insurance on certain paintings alleged to have been destroyed by fire.

The defendant denies liability, alleging: First, that the plaintiff willfully set fire to the room in which he alleges the pictures were contained, or that he procured the setting fire to the room; second, that there were no pictures destroyed by the fire, because, in fact, the plaintiff did not have the pictures he pretended to insure; and, third, that the insurance binder was obtained by misrepresentation and fraud on the part of the plaintiff, not only by his pretending falsely that he possessed the pictures, but also by a false pretense that they were already insured against loss by fire in another insurance company, and that the policy was about to expire.

The greater part of the voluminous evidence in the case refers to the question whether the plaintiff ever had the pictures. That question overshadows all others, because the fire occurred within 12 hours after the insurance binder was issued; and it would seem more like a miracle than like a mere coincidence, or favor of fortune, that the fire that destroyed the best evidence whether the pictures were there or not was only an accident, if the plaintiff obtained the insurance by fraud and misrepresentation, on pictures that he did not have. On the other hand, if the plaintiff really had such pictures as were represented on the list of titles and authors that he made out and submitted to the insurance agent to obtain the insurance, they were really worth a fabulous sum—were valued by him at $58,000— and were insured for only $27,000, all of which would be strong circumstantial evidence that he did not destroy them. The two questions, therefore, whether the plaintiff did or did not misrepresent the existence of the pictures, and whether he did or did not start or procure the starting of the fire that destroyed the contents of the room in which he said the pictures were, may be regarded as one question.

The insurance agents who issued the binder without first making an inspection of the property to be insured were misled by the statement of the agent of the plaintiff who obtained the insurance for him that the pictures were already insured in another company, and that the policy would expire on that day at noon. The plaintiff denies that he told his agent that the pictures were already insured or that the policy was about to expire. He could not have obtained the binder without an inspection, and we believe, from the evidence, that he did make the statement to his representative that the pictures were already insured, and that the policy was about to expire. Whether he did or not is of little importance beside the grave charge on which the defense rests.

The evidence against the plaintiff is, as it is in nearly all such cases, only circumstantial; but it is very strong indeed.

The plaintiff admits that no one ever saw the pictures while he owned them, except the members of his family, a priest, and a strange Spaniard whom, he said, the priest had brought to the house. At the time of the trial the priest was dead, the Spaniard's whereabouts were unknown, and only some of those of the family who were said to have seen the pictures were called to the witness stand. The plaintiff admits that no artist or connoisseur ever saw the pictures in his possession, and that no one outside of his family ever heard of his having them, except the dead priest and the unknown Spaniard, until the insurance was undertaken. The admission of those facts is of grave importance, because of the names of some very famous artists appearing on the list of the pictures furnished by the plaintiff for obtaining the insurance. In fact, according to the testimony of the art experts, the names themselves of some of the artists to whom the plaintiff attributed some of his paintings, not only cast a grave doubt, but was a positive contradiction, of the genuineness of his list. For example, two of the easel pictures, "Just Born" and "Death," valued by the plaintiff at $14,000 on his list, were said to be works of Michelangelo on canvas. The evidence shows conclusively that Michelangelo never painted a small picture on canvas, or on anything but wood or slate, that there is not only no authenticated painting in this country by that most famous sculptor and fresco decorator, but that no dubious picture here is even attributed to him by any student of such art. Nor do such pictures as the plaintiff described in his testimony as "Just Born" and "Death" appear in any of the reliable lists of the works of Michelangelo. The fact is that the plaintiff had no paintings by Michelangelo. There appeared also on the plaintiff's list Jean Francois Millet's most famous work, the "Angelus," which, however, the plaintiff credited to Wikstrom, who, according to the evidence, never painted pictures of human beings, such as the "Angelus." It appears that he attempted two such paintings, but did not finish them. The plaintiff had on his list another picture attributed to Millet, entitled "In the Dark," which he valued at $9,000, and the evidence shows conclusively that Millet was not the author of any such picture as the plaintiff described in his testimony.

Without going further into these details, it is sufficient to say that the proof is overwhelming that the plaintiff did not possess the works of some of the authors whose names appear upon his list. That in itself would not convict him of the fraud charged in this case, because he himself, being no art expert, might have been deceived as to the authenticity of the pictures. But the evidence is quite convincing that the plaintiff knew he had no such pictures as some that were represented on his list. In the first place, his own testimony as to how, where, and under what circumstances he bought the pictures is very unsatisfactory; and the testimony he gave in that respect in his examination under oath before the insurance adjuster (in accordance with lines 87 and 88 of the New York standard fire insurance policy), seven days after the fire, was contradicted in many important points in the testimony given by the plaintiff on the trial of this case, nearly two years afterwards. He claims that he bought the paintings from his brother, paying $14,000 for them in cash; that he had saved the $14,000 from his earnings as a house painter, and kept the money in his residence. We might almost take judicial cognizance that it is not the average man who would or could sleep

in the same house with $14,000 of his own real money. The plaintiff claims that his brother bought the pictures in England. He died before the fire; he had been a mechanic, and had afterwards become a bookmaker on the race tracks. The plaintiff testified that his brother brought the pictures to his house at night, in an automobile, and that he bought and paid for them without having them examined by an artist and without even looking at them himself. Seven days after the fire he testified quite positively that he bought the pictures on the 6th of August, 1912; and in his testimony on the trial, nearly two years later, he said he bought them on the 22d of December, 1911. In his examination, seven days after the fire, he testified, and repeated several times, that his brother owed him $4,500, and that he only paid $9,000 in cash for the pictures, "and called the deal square." He testified that he had said to himself, when he bought the pictures, that he might possibly make $40,000 or $50,000 on the speculation. That means that he thought they were worth $44,-000 to $54,000; yet for two years he never thought of putting them in a safe place or having them insured. On the trial he testified very positively, and repeated several times, that he paid his brother the whole $14,000 in cash. He testified, seven days after the fire, that he did not unpack or examine the pictures when he bought them; and on the trial he testified repeatedly that he did unpack the pictures and distribute them around the wall of the room in which he said they were afterwards destroyed by fire. In his examination before the insurance adjuster he swore that he had no record of the value of the pictures except what his brother had told him, and on the trial he testified that his brother had marked the value on each painting. The description he gave of each picture in his testimony on the trial was very much more complete and in detail than he was able to give seven days

after the fire; and it leaves a strong inference that he had made some preparation in that respect before the trial. In his examination, seven days after the fire, he described the "Angelus" as a water color picture of a nun kneeling, pulling a bell cord on the slow count. On the trial of the case he testified that the "Angelus" was an oil painting, and described it thus:

"In the distance, starting from the back of the painting was a village, then a small church as you get towards the front of the painting, and two human beings, a lady and a man, and the lady has her hands crossed on her bosom, and the man has his hat off, with his hands over his hat. Between them is a small basket, and there is a fork, like a hay fork, sticking in the ground. To the side is a little wagon or truck, or a wheelbarrow possibly, with a couple of sacks on it. * * * Between the village and the fork there is a field, maybe a hayfield, as you cross between the church and the figures to the front of the picture. They had been harvesting. It looks like potatoes they have been digging. There seemed to be some in the basket, the little round basket between the lady and the man."

His description of a picture that he attributed to Millet was very different in his testimony on the trial from the description he gave in the examination a few days after the fire. In his examination, seven days after the fire, he could not possibly remember the title or description of any of the pictures by Gerome. On the trial he described the three, which he had valued at $12,000, with the utmost detail.

We have considered heretofore only the suspicious and improbable circumstances of the plaintiff's side of the case. It must be borne in mind that he should have been better prepared to prove the affirmative, that he had owned the pictures, than was the defendant to prove the negative. The proof is positive and uncontradicted, however, that there was not a remnant nor trace of a picture in the room after the fire, notwithstanding there were remnants of such flimsy articles as Mardi Gras costumes and Japanese fans. There were also large pieces of can-

vas that had been saturated with turpentine, the ashes of which might have been taken for oil paintings if the canvas had not escaped the fire. A chemist went into the room soon after the fire and gathered up all the ashes and charred remnants of what had been burned, and made a careful analysis of it, but was unable to find any element of the ingredients used in oil paintings.

The fire was confined to the one room in which the plaintiff claims the pictures were. It occurred at about 11 o'clock at night. The plaintiff went upstairs alone, and used the instantaneous heater in the bathroom, near the attic room where he says the pictures were, a short time before the fire. He admits that the fire could not have been caused by the instantaneous heater. His conduct after the fire, what he said, what he refrained from saying, and what he refused to discuss, was all very much against him. There is evidence, which, under all the other circumstances of the case, we are constrained to believe, that he hinted at a bribe to the assistant fire marshal soon after the fire, and that a few days later he told the man who had got the insurance binder for him that there would be a couple of hundred dollars in it for him if he would do all he could for him (plaintiff).

We see no good reason for incumbering this report of our opinion with a review of all of the evidence in the case. It presents only questions of fact. Our conclusion is that the suit is an attempt to perpetrate, or rather to consummate, a fraud upon the defendant. There is no occasion for ruling on the question whether the defendant was required to establish the fraud charged by proof beyond a reasonable doubt, or only by a preponderance of evidence; for we are convinced beyond a reasonable doubt.

The judgment appealed from is affirmed at the cost of the appellant.